# IN THE SUPREME COURT OF IOWA

No. 19–1613

Submitted September 16, 2021—Filed November 19, 2021

**STATE OF IOWA,**

Appellee,

vs.

**MICHAEL D. MONTGOMERY,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Sioux County, Julie Schumacher, Judge.

Defendant seeks further review of his conviction for sexual abuse of a child. **DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED FOR A NEW TRIAL.**

Waterman, J., delivered the opinion of the court, in which Christensen, C.J., Mansfield, McDonald, and Oxley, JJ., joined. Appel, J., filed a special concurrence. McDermott, J., filed a separate special concurrence.

Michael J. Jacobsma (argued) of Jacobsma Law Firm, P.C., Orange City, for appellant.

Thomas J. Miller, Attorney General, and Sheryl Soich (argued), Assistant Attorney General, for appellee.

**WATERMAN, Justice.**

In this appeal, we must decide whether to overrule *State v. Pearson*, 514 N.W.2d 452, 455–56 (Iowa 1994) (en banc), and separately decide whether the district court properly applied the "constitutional rights" exception to the rape shield law, Iowa Rule of Evidence 5.412(*b*)(1)(C). The jury convicted the defendant of sexual abuse of a child (his granddaughter) but acquitted him of lascivious acts with the same child. The defendant appealed, arguing both crimes should require proof he sought sexual gratification, an element *Pearson* held is not required to prove sexual abuse. The defendant argues *Pearson* should be overruled, which would result in the reversal of the sexual abuse conviction as a result of his acquittal on the lascivious acts charges. The State responds that *Pearson* remains good law and precludes reversal on that ground.

The defendant also argues the district court erred by excluding evidence that another person, a teenager who testified for the State, sexually abused his granddaughter, who simultaneously reported both abusers. The defendant made an offer of proof that the teenager admitted abusing her and that a clinical psychologist would testify his abuse affected her testimony. We transferred the case to the court of appeals, which affirmed his conviction based on *Pearson* and rule 5.412 while noting the scope of the "constitutional rights" exception to the rape shield law is unclear. We granted the defendant's application for further review.

On our review, we apply stare decisis and decline to overrule *Pearson*. The legislature codified a sexual gratification element for lascivious acts but not for

sexual abuse, which can be proven by sexual contact without a motive of sexual gratification. We reaffirm *Pearson* and again decline to engraft an additional element the legislature omitted. We therefore reject defendant's arguments based on the allegedly inconsistent verdict. The evidentiary issue presents a closer question. The victim simultaneously reported the abuse by the defendant and the teenager, which involved similar acts and occurred close in time. The defendant should have been allowed to cross-examine his granddaughter and the teenager about their relationship as a source of her age-inappropriate sexual knowledge and their bias or motive to testify against the defendant. Excluding that evidence violated the defendant's rights under the Confrontation and Due Process Clauses and the constitutional rights exception to the rape shield law. For the reasons explained below, we reverse his conviction and remand this case for a new trial.

## I. Background Facts and Proceedings.

In May 2016, when S.V. was eight years old, she confided in a friend that her grandfather Michael Montgomery, age sixty, had touched her inappropriately between her legs at his home in Hospers, Iowa. The friend urged S.V. to tell her mother or another adult. S.V. told her mother, who promptly confronted Montgomery. He became "angry and very defensive." S.V.'s mother did not report the abuse to the police that year because she feared losing custody of her daughter to her ex-husband and because Montgomery was battling stage IV cancer. During the same year, S.V. watched pornography at a friend's house, and her mother also caught her watching pornography at home.

From 2015 to the summer of 2018, S.V. lived with her mother in Sheldon, Iowa, at the home of her mother's boyfriend and his son L.V. Although the adults were unmarried, S.V. regarded L.V. as a "brother." L.V. is four and one half years older than S.V. In the summer of 2016, S.V. told L.V. that Montgomery had been licking her and touching her for a long time in Montgomery's bedroom. In the ensuing months, L.V. began touching S.V. sexually, usually after L.V. let her play on his phone. L.V. sexually abused S.V. on about six occasions, most often in L.V.'s bedroom in Sheldon. The last time L.V. touched S.V. sexually was on May 13, 2018. A few days later, S.V. told her friend that she had been inappropriately touched by Montgomery and by L.V. The friend suggested S.V. tell their school counselor and then walked with S.V. to the guidance office, where S.V. revealed her abuse by both males. The guidance counselor reported the allegations to the Iowa Department of Human Services and called S.V.'s mother to let her know.

On May 16, S.V. was physically examined by a nurse and interviewed by a forensic interviewer at the MercyOne Child Advocacy Center (CAC) in Sioux City. The CAC nurse observed that S.V.'s physical exam was normal, which is not uncommon for sexual abuse because vaginal tissue heals quickly. S.V. disclosed she had been sexually abused by L.V. and also by Montgomery. In the CAC interview, S.V. reported that Montgomery licked her and fingered her. He would make her grab his private part and sometimes she woke up to him kissing her. She reported that L.V. initially only kissed her. Then, L.V. began licking and fingering her and making her grab his private part. S.V. suggested that L.V.

started sexually touching her because she told him about what Montgomery did. S.V. said she felt bad for telling on her "brother" and was worried that her mom would be mad or L.V. would tell first and get her in trouble. L.V. admitted to his sexual contacts with S.V. and was charged with sexual abuse in delinquency proceedings.

In a videotaped police interview, Montgomery acknowledged that S.V. sometimes slept in his bed with him and his wife Brenda. Montgomery admitted to police that on one occasion, he was taking a shower and S.V. came in, took her clothes off, and joined him in the shower. He told her to leave, and when she remained, he left the shower. He also admitted that on another occasion, S.V. grabbed his hand while they were in his bed and placed his hand on her groin. He immediately pulled his hand away and told her that was inappropriate. When S.V. again grabbed his hand and placed it on her groin, Montgomery kicked her out of his bedroom. When asked if S.V. was clothed, Montgomery responded that he was wearing clothes without answering with respect to S.V. When the detective followed up to again ask if S.V. was clothed, Montgomery said he did not remember whether S.V. was wearing clothes at that time. According to Brenda, the grandchildren only watched movies with them in their bed two or three times, and she remained in the bed.

After his police interview, a friend of Montgomery's confronted him about S.V.'s allegations. Montgomery responded that he "didn't do anything that [S.V.] didn't initiate first" and "why would he do anything with [S.V.] when he has Brenda."

In September, the State charged Montgomery with sexual abuse in the second degree, in violation of Iowa Code sections 709.1, 709.3(1)(*b*), and 903B.1 (2015), and lascivious acts with a child for permitting or causing a child to fondle, in violation of Iowa Code sections 709.1, 709.8(1)(*a*), 709.8(1)(*b*), 709.8(2)(*a*), and 903B.1. The State alleged Montgomery's criminal acts occurred in 2015 or 2016.[1] Montgomery pled not guilty, and the case proceeded to trial.

Before trial, Montgomery timely moved to admit evidence under Iowa Rule of Evidence 5.412 and filed an offer of proof. Montgomery argued that under Iowa's rape shield law, he should be permitted to present evidence of L.V.'s sexual abuse of S.V. as necessary for his "constitutional right to offer a defense to the charges made against him." He contended the evidence demonstrates that S.V. may have made up the allegations against Montgomery to protect L.V. The State resisted, arguing a defendant lacks a constitutional right to present irrelevant information. Montgomery further argued the evidence should come in to refute the nurse's testimony about an injury without physical symptoms; the State responded that the nurse made no finding of a physical injury.

The district court made a preliminary ruling excluding the evidence. The court found that evidence of L.V.'s improper conduct did not fall within the exceptions in rule 5.412 to rebut physical evidence, prove consent, or protect the defendant's constitutional rights, and found that the probative value of the evidence "does not outweigh the substantial danger of unfair prejudice,

---

[1]The relevant portions of the Iowa Code are the same for 2015 and 2016. We refer to the 2015 Iowa Code.

confusion of issues, misleading of the jury, and invasion of complainant's privacy which [Iowa's] and other rape shield laws are designed to prevent." At trial, Montgomery renewed his motion to admit the evidence and made another offer of proof supported by an expert psychologist who opined L.V.'s abuse affected S.V.'s memories. The district court excluded the evidence.

The State played for the jury Montgomery's videotaped police interview. S.V. testified at trial that Montgomery kissed her back, tried to put his fingers in her mouth, would take off her clothes and underwear, and touched her vagina with his tongue or finger. She testified that she could feel the wetness from his tongue and that his penis felt "textured" and "muscly." The jury never heard that S.V. had simultaneously reported abuse by L.V. as well as Montgomery.

S.V.'s trial testimony omitted any mention of L.V.'s abuse. The nurse testified about her physical examination of S.V. without mentioning L.V. Her typed history and examination report, admitted into evidence, showed she identified Montgomery as her abuser but was redacted to remove S.V.'s contemporaneous identification of L.V. as another abuser. S.V.'s friend testified about S.V. disclosing Montgomery's abuse to her, but without mentioning she also disclosed L.V.'s abuse in the same conversation. The investigating deputy testified without mentioning L.V.'s abuse. The State called L.V. as a witness to testify about S.V. telling him about her grandfather's abuse. L.V. did not testify about his abuse of S.V. Montgomery's defense counsel was prohibited from cross-examining L.V. or any of the other trial witnesses about L.V.'s own sexual abuse of S.V.

Montgomery did not testify at trial. The district court limited the testimony of Montgomery's defense expert, clinical psychologist Dr. Rosanna Jones-Thurman, barring her opinion that S.V.'s memories with Montgomery could be contaminated by the sexual touching she experienced with L.V. and that she has seen children accuse someone else to protect the real perpetrator. Dr. Jones-Thurman was only allowed to testify that children are not very good at spatial timing, exposure to pornography could influence a child's memory, and she saw no evidence Montgomery groomed S.V.

During its deliberations, the jury asked the court for clarification on jury instruction No. 16 that used "sexual in nature" to define a "sex act" for the sexual abuse in the second-degree charge. Montgomery urged the district court to clarify that "sexual in nature" meant "for the purpose of satisfying the sexual desires of defendant." The State resisted. The district court declined Montgomery's proposed supplemental instruction and told the jury to "review the instructions as a whole."

After four hours of deliberations, the jury notified the district court that it had reached a verdict on the lascivious acts charge but could not reach a unanimous verdict on the sexual abuse charge. The court instructed the jury to continue deliberations. Thirty minutes later, the jury returned a verdict finding Montgomery guilty of sexual abuse in the second degree and not guilty of lascivious acts with a child. The district court denied Montgomery's motion for a new trial. Montgomery was sentenced to twenty-five years in prison with a mandatory minimum of seventy percent, or seventeen and half years.

Montgomery appealed, arguing *Pearson* should be overruled to require proof of a purpose of sexual gratification for a sexual abuse conviction. He raised several related arguments that fail if *Pearson* remains good law: (1) the district court erred by rejecting his supplemental jury instruction requiring such proof, and (2) the jury verdict is inconsistent because his acquittal on the lascivious acts charge requiring such proof precludes his conviction for sexual abuse. Montgomery also argued the district court erred in excluding evidence of L.V.'s sexual abuse of S.V. under the rape shield law. He further argued that the prosecutor improperly vouched for S.V.'s credibility during his closing argument. Finally, Montgomery argued his conviction was not supported by sufficient evidence and was contrary to the great weight of the credible evidence.

We transferred the case to the court of appeals, which affirmed Montgomery's conviction. The court of appeals rejected Montgomery's arguments that the evidence of guilt was insufficient or against the greater weight of the evidence, noting Montgomery's own admissions supported the verdict. The court of appeals concluded the jury verdict is not inconsistent because lascivious acts is not a predicate offense of sexual abuse and separate incidents were alleged. The court of appeals found Montgomery failed to preserve error regarding the supplemental jury instruction or the prosecutor's closing argument and determined that the district court did not abuse its discretion applying the rape shield law because the probative value of evidence of L.V.'s abuse did not outweigh the unfair prejudice. The court of appeals noted that it could not overrule *Pearson* and that the scope of the constitutional rights exception to rule

5.412 was unclear. Montgomery applied for further review, and we granted his application.

## II. Scope of Review.

We exercise our discretion to limit our review to deciding (1) whether to overrule *Pearson* and determine if the jury was properly instructed or its verdict inconsistent, and (2) to review the exclusion of evidence of L.V.'s abuse under the rape shield law. The court of appeals decision shall stand as the final opinion in this appeal on the remaining issues raised in Montgomery's appeal. *See Papillon v. Jones*, 892 N.W.2d 763, 765 (Iowa 2017).

"[W]e review challenges to jury instructions for correction of errors at law." *State v. Benson*, 919 N.W.2d 237, 241 (Iowa 2018) (alteration in original) (quoting *Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 707 (Iowa 2016)). "We also 'review refusals to give a requested jury instruction for correction of errors at law.' " *Id.* at 242 (quoting *Alcala*, 880 N.W.2d at 707). "The consequence of a potentially inconsistent jury verdict is a question of law, and accordingly, our review is de novo." *State v. Merrett*, 842 N.W.2d 266, 272–73 (Iowa 2014). "Questions of statutory interpretation are reviewed for correction of errors at law." *State v. Wilson*, 941 N.W.2d 579, 584 (Iowa 2020).

We review rulings on the admissibility of evidence under the rape shield law, Iowa Rule of Evidence 5.412, for abuse of discretion. *State v. Walker*, 935 N.W.2d 874, 877 (Iowa 2019). We apply a de novo standard of review to claimed violations of the constitutional right to present a defense, *State v. Clark*, 814 N.W.2d 551, 560 (Iowa 2012), and the Sixth Amendment right to confrontation,

*see State v. Jones*, 490 N.W.2d 787, 789 (Iowa 1992), *overruled on other grounds by State v. Plain*, 898 N.W.2d 801, 824–26 (Iowa 2017).

**III. Analysis.**

**A. *State v. Pearson.*** We first address Montgomery's argument to overrule *Pearson*. The State contends that Montgomery failed to preserve error on his claim that *Pearson* should be overruled because he never made that argument at trial. Montgomery, however, did argue during trial that the district court should include an element of sexual gratification to prove sexual abuse and sought a supplemental jury instruction to that effect—the issue decided in *Pearson*. The district court refused to give the supplemental instruction. "Generally, error is preserved on an issue if (1) a party raises the issue before the district court, (2) the district court rules upon the issue, and (3) the party again raises the issue on appeal." *State v. Gross*, 935 N.W.2d 695, 698 (Iowa 2019). And Montgomery's posttrial motion expressly called for *Pearson* to be overruled, stating that "it is time that Iowa courts follow the directive of Justice Carter in his partial dissent opined in *Pearson* and require that the [S]tate prove that the act be committed with an intent of sexual gratification of the defendant or victim" and following the statement with the citation "*See Pearson* at 457." The district court decided the issue by denying the motion. Montgomery raised the issue again on appeal. We conclude he preserved the issue for our review.

1. Pearson*'s "sexual in nature" definition.* In *Pearson*, we decided that a sex act for purposes of Iowa Code section 702.17 does not have to be made to arouse or satisfy the sexual desires of the perpetrator or the victim, so long as the act is

"sexual in nature." 514 N.W.2d at 455. The defendant argued that because both he and his victim remained clothed, there was no "sexual contact" required for a conviction. *Id.* at 454. We noted the need to distinguish innocent contact and sexual contact and held that for contact to be a "sex act" it "must be between the specified body parts (or substitutes) and must be sexual in nature." *Id.* at 455. Among the circumstances to consider is "whether the contact was made to arouse or satisfy the sexual desires of the defendant or the victim"; however, we held that purpose is not required if other circumstances exist to show that the contact is sexual. *Id.* Justice Carter dissented in part, stating,

> I believe that it is axiomatic that any time two persons are moving about in close proximity to one another innocent contact may occur between sexual parts. The majority recognizes this and attempts to distinguish prohibited sexual contact from innocent contact. The majority includes, as a criterion for determining sexual contact, "the purposefulness of the contact." At the same time, it disavows any requirement that there be an intent to act based on sexual gratification of either the perpetrator or the victim. The circumstances that the majority would consider in determining whether sexual contact has occurred would also be relevant to show an intent to act based on sexual gratification. However, by not recognizing sexual gratification as an element of sexual contact, the majority prohibits a defendant from attempting to negate the charge by urging lack of such intent. I believe that this is unrealistic and unfair.

*Id.* at 457 (Carter, J., concurring in part and dissenting in part).

Justice Snell's separate dissent argued that under *Pearson*, individuals can be convicted of sexual abuse without any sex involved. *Id.* at 460 (Snell, J., dissenting); *see also State v. Monk*, 514 N.W.2d 448, 452 (Iowa 1994) (en banc) (Snell, J., dissenting) ("The holdings in *State v. Pearson* and *State v. Monk* have transformed our sex abuse statutes into general assault statutes where the

assault has some effect on the reproductive or excretory organs of the victim or defendant.").

Montgomery argues that *Pearson*'s reasoning is "unsound, confusing, and unworkable" and that we should adopt the dissenting view to require a finding of sexual gratification for a "sex act." We disagree and view *Pearson* as correctly decided. We also apply stare decisis and decline to overrule it. *See Book v. Doublestar Dongfeng Tyre Co.*, 860 N.W.2d 576, 594 (Iowa 2015) ("Stare decisis alone dictates continued adherence to our precedent absent a compelling reason to change the law."). *Pearson* was decided twenty-seven years ago, and its holding has not proven unworkable. "Under the doctrine of legislative acquiescence, 'we presume the legislature is aware of our cases that interpret its statutes. When many years pass following such a case without a legislative response, we assume the legislature has acquiesced in our interpretation.' " *State v. Iowa Dist. Ct.*, 902 N.W.2d 811, 818 (Iowa 2017) (quoting *Ackelson v. Manley Toy Direct, L.L.C.*, 832 N.W.2d 678, 688 (Iowa 2013)). Indeed, the legislature recently amended section 709.3, defining sexual abuse, and section 702.17, defining "sex act," without overruling *Pearson*. *See* 2021 Iowa Acts ch. 36, §§ 1–2 (to be codified at Iowa Code § 702.17 (2022)); *id.* ch. 37, § 3 (to be codified at Iowa Code § 709.3(1)(*b*) (2022)).

We again decline to engraft an additional element of sexual gratification that the legislature chose to omit. The legislature knows how to require that conduct be done for "the purpose of arousing or satisfying the sexual desires of either" party because it has codified that element in other criminal statutes. *See*

Iowa Code §§ 709.8 (lascivious acts with a child), .9 (indecent exposure from masturbation), .12 (indecent contact with a child), .14 (lascivious conduct with a minor), .15 (sexual exploitation by a counselor or therapist). We assume the legislature intended to omit that element from the sexual abuse statute.

There are valid policy reasons why the legislature might want to criminalize sexual abuse that is not for the purpose of sexual gratification. For example, some sexual abuse is performed to exert power or control over the victim without a motivation of sexual gratification. *See, e.g., State v. Davis*, 584 N.W.2d 913, 917 (Iowa Ct. App. 1998). We decline to modify our prior interpretation of section 709.3. *Pearson* remains good law.

2. *Allegedly inconsistent verdict.* Montgomery argues that both lascivious acts and sexual abuse require proof of a motive of sexual gratification such that his acquittal on the former is inconsistent with his conviction on the latter. Because we decline to overrule *Pearson*, Montgomery's argument fails.

Under *Pearson*, the jury verdict finding Montgomery guilty of sexual abuse and acquitting him of lascivious acts is not inconsistent. We begin with the statutory language of the offenses. The statue defining lascivious acts with a child provides: "It is unlawful for any person sixteen years of age or older to perform any of the following acts with a child with or without the child's consent unless married to each other, *for the purpose of arousing or satisfying the sexual desires of either of them . . . .*" Iowa Code § 709.8(1) (emphasis added). By contrast, as we have just reaffirmed, a conviction for sexual abuse does not require a motive of sexual gratification.

"If jury verdicts are to be examined for inconsistency, the test to be applied is whether the verdict is so logically and legally inconsistent as to be irreconcilable within the context of the case." *Merrett*, 842 N.W.2d at 275–76 (quoting *State v. Fintel*, 689 N.W.2d 95, 101 (Iowa 2004)). The jury's decision to acquit Montgomery of lascivious acts with a child and not sexual abuse in the second degree is not legally impossible. Unlike lascivious acts with a child, sexual abuse in the second degree does not have the requirement that the defendant's conduct be "for the purpose of arousing or satisfying the sexual desires of either of them." As the court of appeals correctly noted, lascivious acts with a child is not a predicate offense or component of sexual abuse in the second degree. Said another way, lascivious acts with a child does not include only elements that are also elements of sexual abuse in the second degree. *See State v. Johnson*, 950 N.W.2d 21, 24 (Iowa 2020) (applying legal-elements test).

Next, the jury's decision to acquit Montgomery of lascivious acts with a child and not sexual abuse in the second degree is not logically impossible. Even though it appears that the jury did not credit much of S.V.'s testimony, the jury could have relied in part on Montgomery's own statements that S.V. used his hand to explore herself and that he admittedly "didn't do anything that [S.V.] didn't initiate first." Consistent with *Pearson*, the jury could find Montgomery's hand made sexual contact with S.V.'s vagina twice, but without a motive of sexual gratification. Thus, the jury verdict is not legally or logically inconsistent.

3. *Jury instructions.* Jury Instruction No. 14 stated for the sexual abuse charge that the State had to prove "[o]n or between February 1, 2015, and

August 16, 2016, Michael Montgomery did commit a sex act with S.V." and "Michael Montgomery performed the sex act while S.V. was under the age of 12 years." Instruction No. 16 defined "sex act":

> Concerning Element Number 1 of Instruction No. 14, "sex act" means any sexual contact:
>
> Between the mouth of one person and the genitals of another; or
>
> Between the finger or hand of one person and the genitals or anus of another person.
>
> You may consider the type of contact and the circumstances surrounding it in deciding whether the contact was sexual in nature.

Montgomery had not objected to those instructions. But during deliberations, the jury asked for clarification of the last sentence of Instruction No. 16. Montgomery's counsel responded, "I do think that perhaps some clarification should be given to the jury as to what 'sexual in nature' means in that the action has to be for the purpose of satisfying the sexual desire of the defendant." The court declined, stating, "The Court finds no clarification is necessary in regard to Instruction No. 16 and would direct the jury to review the instructions as a whole in reaching their verdict and follow the instructions previously given by the court." Montgomery's posttrial motion argued the court should have provided a list of the *Pearson* factors as part of the clarifying instruction. On appeal, Montgomery argues the *Pearson* factors should have been a part of the original jury instruction defining "sex act." Assuming without deciding that he preserved error for his arguments concerning the "sex act" jury instruction, we conclude the district court properly instructed the jury on what

constitutes a "sex act" and correctly refused Montgomery's proposed supplemental instruction. The instructions given tracked the statutory elements and Montgomery's requested supplemental instruction was contrary to *Pearson.*

**B. Exclusion of Evidence under Iowa Rule of Evidence 5.412.** We must decide whether Montgomery's proffered evidence that L.V. abused S.V. was properly excluded under the rape shield law. We begin with the text of the rule, which provides in pertinent part:

> *a. Prohibited uses.* The following evidence is not admissible in a criminal proceeding involving alleged sexual abuse:
>
> (1) Reputation or opinion evidence offered to prove that a victim engaged in other sexual behavior.
>
> (2) Evidence of a victim's other sexual behavior other than reputation or opinion evidence.
>
> *b. Exceptions.*
>
> (1) *Criminal cases.* The court may admit the following evidence in a criminal case:
>
> (A) Evidence of specific instances of a victim's sexual behavior, if offered to prove that someone other than the defendant was the source of semen, injury, or other physical evidence.
>
> (B) Evidence of specific instances of a victim's sexual behavior with respect to the person accused of sexual abuse, if the defendant offers it to prove consent.
>
> (C) Evidence whose exclusion would violate the defendant's constitutional rights.
>
> . . . .
>
> *c. Procedure to determine admissibility.*
>
> . . . .
>
> (2) *Hearing. . . .*

(C) If the court determines that the evidence is relevant and that the probative value outweighs the danger of unfair prejudice, the evidence will be admissible at trial to the extent the court specifies, including the evidence on which the victim may be examined or cross-examined.

Iowa R. Evid. 5.412.

The purpose of the rape shield rule "is to protect the victim's privacy, encourage the reporting and prosecution of sex offenses, and prevent the parties from delving into distractive, irrelevant matters." *State v. Trane*, 934 N.W.2d 447, 456–57 (Iowa 2019) (quoting *State v. Edouard,* 854 N.W.2d 421, 448–49 (Iowa 2014), *overruled on other grounds by Alcala*, 880 N.W.2d 669); *see also State v. Donahue,* 957 N.W.2d. 1, 8 (Iowa 2021). The rule "substantially limits the admission of evidence of specific instances of a complaining witness's other sexual behavior." *Trane*, 934 N.W.2d at 456.

Evidence concerning L.V.'s sexual abuse of S.V. is subject to rule 5.412. The rule generally prohibits evidence of specific instances of a victim's "other sexual behavior," which includes previous instances of sexual abuse perpetrated upon the victim. *Jones*, 490 N.W.2d at 790 (surveying rape shield cases and following majority in holding "past sexual behavior" in rule 5.412 "clearly encompasses prior sexual abuse perpetrated upon the victim"); *see also Westley v. State*, 254 A.3d 106, 117 (Md. Ct. Spec. App. 2021) (construing "prior sexual conduct" in Maryland's rape shield law to include prior sexual abuse, not just "prior *willing* sexual conduct").

Montgomery's proffered evidence is inadmissible unless an exception applies. Montgomery relies on two exceptions: Iowa Rule of Evidence

5.412(*b*)(1)(A) (source of semen, injury, or other physical evidence exception) and rule 5.412(*b*)(1)(C) (constitutional rights exception). We address each exception in turn.

The district court and court of appeals correctly rejected Montgomery's argument under the first exception that allows evidence to rebut the State's argument that the "defendant was the source of semen, injury, or other physical evidence." Iowa R. Evid. 5.412(*b*)(1)(A). We hold that under its plain meaning, this exception is limited to *physical* evidence, such as semen, or a *physical* injury. Neither is present here. Our interpretation is consistent with federal and state cases interpreting the injury requirement.[2] *See United States v. Shaw*, 824 F.2d 601, 603 n.2 (8th Cir.1987) ("Furthermore, it is clear that Rule 412's injury exception does not apply to emotional injuries unaccompanied by a cognizable physical consequence." (citing 124 Cong. Rec. 34,913 (1978) (subdivision (*b*)(2)(A) applies to "certain physical consequences"))), *abrogated on other grounds by Idaho v. Wright*, 497 U.S. 805 (1990); *State v. Rolon*, 777 A.2d 604, 613 n.18 (Conn. 2001) ("The defendant also made a 'source of injury' argument. Because

---

[2]We have looked to federal precedent as persuasive authority to interpret the same language in Iowa Rule of Evidence 412 (now rule 5.412). *See, e.g., Jones*, 490 N.W. 2d at 790. When, as here, our rule of evidence and its federal counterpart are worded identically in relevant respects, "interpretations of the federal rule are often persuasive authority for interpretation of our state rule." *State v. Paredes*, 775 N.W.2d 554, 561 (Iowa 2009). "Federal case law, however, is not binding, and we are free to develop our own approach to legal questions under the Iowa rule." *Id.* We have also noted that the "legislative history of federal rule 412 is instructive." *State v. Clarke*, 343 N.W.2d 158, 162 (Iowa 1984); *see also State v. Harrington*, 800 N.W.2d 46, 49 n.1 (Iowa 2011) ("Since many of the Iowa Rules here recommended are modeled after the Federal Rules of Evidence, it is contemplated that judges and lawyers will look for guidance to the United States Supreme Court Advisory Committee Notes." (quoting Iowa R. Evid. official comment (1983))).

psychological trauma is not recognized as an 'injury' under [Connecticut's rape shield law], the court did not consider this argument.").[3]

Montgomery has a better argument under the constitutional rights exception in rule 5.412(*b*)(1)(C). That exception codifies a safety valve to avoid an unconstitutional application of the rape shield rule. In addressing the constitutionality of rape shield laws, the Supreme Court cautioned that "[r]estrictions on a criminal defendant's rights to confront adverse witnesses and to present evidence 'may not be arbitrary or disproportionate to the purposes they are designed to serve.'" *Michigan v. Lucas*, 500 U.S. 145, 151 (1991) (quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)); *see also State v. Boyer*, 460 P.3d 569, 580 (Utah Ct. App. 2020) (describing the constitutional rights exception as a "high bar" requiring the defendant to "show that 'the evidence in question is essential to the presentation of [his] defense'" (quoting *State v. Thornton*, 391 P.3d 1016, 1030 (Utah 2017))).

> Other courts confronted with the necessity of accommodating the competing interests of complaining witnesses and defendants in such cases have concluded that rape shield statutes should be construed and applied so as to uphold the constitutional rights of defendants, while creating the least possible interference with the legislative purpose reflected in the statutes.

*Summit v. State*, 697 P.2d 1374, 1376 (Nev. 1985). We agree.

Accordingly, we reiterate that "[t]he defendant's constitutional rights must be weighed against the recognized interest that the State has 'to (1) protect the

---

[3]When *State v. Rolon* was decided, Connecticut's rape shield law prohibited "evidence of the sexual conduct of the victim . . . unless such evidence is (1) offered by the defendant on the issue of whether the defendant was, with respect to the victim, the source of semen, disease, pregnancy or injury." Conn. Gen. Stat. § 54-86f (2001).

privacy of the victims; (2) [to] encourage the reporting and prosecuting of sex offenses; and (3) to prevent time-consuming and distracting inquiry into collateral matters.'" *Jones*, 490 N.W.2d at 791 (quoting *State v. Gettier*, 438 N.W.2d 1, 3 (Iowa 1989)). And evidence can only be admitted if it is relevant and its "probative value outweighs the danger of unfair prejudice." Iowa R. Evid. 5.412(*c*)(2)(C); *see Thompson v. State*, 492 N.W.2d 410, 415 (Iowa 1992) (holding that evidence within a rule 5.412 exception "still would not be admissible if its probative value did not outweigh the danger of substantial prejudice, confusion of the issues, and misleading the jury").

In addition to the heightened standard imposed by rule 5.412 to protect victims of sexual abuse, evidence can be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Iowa R. Evid. 5.403; *see also Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (holding that a trial court can reasonably limit the right to confrontation when considering "harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that [would be] repetitive or only marginally relevant"); Laurie Kratky Doré, *Iowa Practice Series: Evidence* § 5.412:1 (2020–2021 ed. 1999) [hereinafter Doré] ("Iowa courts have repeatedly indicated that an accused does not have a constitutional right to admit evidence of a victim's other sexual behavior that is irrelevant or whose probative value is outweighed by unfair prejudice.").

Montgomery relies on his due process right to a fair trial. U.S. Const. amends. V, VI, XIV; Iowa Const. art. I, §§ 9–10. This includes the right to present a defense and his Sixth Amendment right to confront the witnesses against him. *Clark,* 814 N.W.2d at 560; *State v. Clarke,* 343 N.W.2d 158, 161 (Iowa 1984). Cross-examination is essential to the defendant's constitutional right of confrontation. *Davis v. Alaska,* 415 U.S. 308, 315–16 (1974). "[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id.* at 316–17.[4]

Montgomery argues his constitutional right to present a defense was violated because he was unable to introduce evidence concerning L.V.'s sexual abuse of S.V. Montgomery argues the evidence was admissible under the constitutional rights exception to show S.V. conflated her memories of sexual abuse, to explain S.V.'s age-inappropriate sexual knowledge, and to cross-examine S.V. and L.V. regarding their motive or bias given the closeness of their relationship. We address each argument in turn.

First, Montgomery argues his proffered expert testimony was admissible to show S.V. confused her memory of abuse. According to Montgomery's offer of proof, Dr. Jones-Thurman's supplemental testimony opined that S.V. has "contaminated some of her memories about what was going on with [L.V.] with what she could have conceived happening with [Montgomery]." The court of appeals held Dr. Jones-Thurman's testimony on memory contamination was

---

[4]Cross-examination has been recognized as "the 'greatest legal engine ever invented for the discovery of truth.' " *California v. Green,* 399 U.S. 149, 158 (1970) (quoting 5 John Henry Wigmore, Wigmore on Evidence § 1367 (3d ed. 1940)).

inadmissible under *State v. Dudley*, which reaffirmed Iowa's "law prohibiting an expert witness from commenting on the credibility of a victim in a criminal sex abuse proceeding." 856 N.W.2d 668, 676 (Iowa 2014). The prohibition is designed to respect the jury's role in determining credibility of witnesses and to avoid an expert "directly or indirectly . . . giving his or her scientific certainty stamp of approval on the testimony even though an expert cannot accurately opine when a witness is telling the truth." *Id.* at 676–77. Yet *Dudley* would not bar Dr. Jones-Thurman's expert testimony that child victims *generally* may conflate their memories of abuse. *See id.* at 676.

The State argues that it strains credulity to suggest S.V. would confuse what her grandfather did with the acts of the teenaged L.V. The State relies on *State v. Jones*, where we affirmed the district court's rule 5.412 exclusion of evidence because "[t]here is no likelihood" the victim confused her memories when the alleged prior abuse occurred five years earlier when the victim was age five and "involved completely different types of contact." 490 N.W.2d at 791. By contrast, L.V.'s abuse began shortly after Montgomery's ended and involved similar sex acts, and expert testimony was offered to suggest this influenced S.V.'s testimony. It is possible that some of her memories of aspects of L.V.'s abuse seeped into her descriptions of Montgomery's abuse. But we likely would not reverse on this ground alone.

Second, Montgomery argues evidence of L.V.'s abuse was admissible to show another source for S.V.'s age-inappropriate sexual knowledge that a penis feels "muscly" and thereby rebut the inference that her knowledge must have

come from Montgomery's abuse. "[A] child victim's sexual knowledge [that] resulted from an encounter with someone other than the defendant may be relevant and material to a defendant's defense of mistaken identity or false accusation." *Walker*, 935 N.W.2d at 877 (quoting *State v. Cecil J.*, 913 A.2d 505, 512 (Conn. App. Ct. 2007)); *see also id.* at 882 (Appel, J., concurring specially) (collecting cases); *Westley*, 254 A.3d at 132 ("We join the majority of state courts that have considered this issue in determining that when a defendant seeks to admit evidence of a victim's prior sexual conduct to dispel a presumption of sexual innocence, a court must assess on a case-by-case basis whether the exclusion of such evidence would violate the defendant's constitutional rights."); *State v. Howard*, 426 A.2d 457, 462 (N.H. 1981) (holding evidence of prior sexual abuse should have been admitted under a rape shield law exception to show source of knowledge because "the average juror would perceive the average twelve-year-old girl as a sexual innocent"); *State v. Pulizzano*, 456 N.W.2d 325, 334–35 (Wis. 1990) (holding rape shield exclusion ruling violated defendant's constitutional right to cross-examine child complainant about prior sexual abuse to show alternative source for sexual knowledge). *But see State v. Erick L.*, 147 A.3d 1053, 1064 (Conn. App. Ct. 2016) (affirming exclusion of evidence because "the sexual knowledge displayed in [the twelve-year-old victim's] allegations against the defendant was not unusual and was consistent with what middle schoolers and high schoolers are commonly taught about sex").

In *State v. Westley*, the Court of Special Appeals of Maryland identified a threshold requirement for assessing whether excluding such evidence violates

the defendant's constitutional rights: "a court must first determine if the facts of the case actually give rise to a presumption of sexual innocence." 254 A.3d at 132. The court elaborated:

> In doing so, a court should consider, among other relevant factors, the age of the child, the maturity of the sexual behavior alleged, whether the child's allegations necessarily suggest sexual knowledge beyond what a child of that age would presumedly [sic] possess, whether the State has introduced evidence suggestive of sexual innocence, and whether there is other evidence that the victim possessed sexual knowledge before reporting the conduct at issue.

*Id.* These factors support admissibility here: S.V. was age ten in her CAC interview and presumably most girls of that age would not know an erect penis feels muscly. The *Westley* court also included "the proximity in time between the prior sexual conduct and the complainant's allegations" as another factor to consider. *Id.* Here, L.V.'s abuse began shortly after Montgomery's alleged abuse.

The Wisconsin Supreme Court separately identified five other requirements in *State v. Pulizzano*, holding that

> to establish a constitutional right to present otherwise excluded evidence of a child complainant's prior sexual conduct for the limited purpose of proving an alternative source for sexual knowledge, prior to trial the defendant must make an offer of proof showing (1) that the prior acts clearly occurred; (2) that the acts closely resembled those of the present case; (3) that the prior act is clearly relevant to a material issue; (4) that the evidence is necessary to the defendant's case; and (5) that the probative value of the evidence outweighs its prejudicial effect.

456 N.W.2d at 335; *see also Rolon*, 777 A.2d at 623 (adopting same factors); *State v. Johnson*, 944 P.2d 869, 878 (N.M. 1997) ("We also agree with the Wisconsin Supreme Court that a showing sufficient under the five-pronged [Wisconsin] test establishes a constitutional right to present evidence otherwise

excluded by our [rape shield] statute."). Those five factors are satisfied here.[5] L.V. admitted to the same conduct allegedly committed by Montgomery (having S.V. touch his penis), satisfying the first two factors. Evidence of L.V.'s abuse rebuts the inference that S.V.'s knowledge could only have come from Montgomery, satisfying the next three factors. Particularly salient here is the temporal proximity of Montgomery's alleged abuse and L.V.'s abuse that closely followed, together with S.V.'s ongoing relationship with L.V., a witness for the prosecution, at the time she simultaneously reported abuse by both of them.

We find *State v. Twardoski* to be persuasive because the allegations against the teenager and Montgomery are similar. 491 P.3d 711, 719–21 (Mont. 2021). In *Twardoski,* the Montana Supreme Court held that the trial court erred by excluding evidence of prior sexual abuse committed by another man criminally charged for an identical sexual game of truth or dare allegedly performed by the defendant less than two weeks later as relevant to show the same victim's source of "detailed sexual knowledge." *Id.*

Iowa's precedent on the constitutional rights exception is limited. In *State v. Walker*, the twenty-six-year-old defendant was convicted of sexually abusing

---

[5]Our district courts should determine admissibility of such evidence under the constitutional rights exception in rule 5.412(*b*)(1)(C) case by case. We quote the factors considered by other courts "to suggest a possible framework" while recognizing "[t]here may be other showings that are equally sufficient" to meet the constitutional rights exception to the rape shield rule. *Johnson*, 944 P.2d at 878; *see also State v. Townsend*, 233 S.W.3d 680, 684–85 (Ark. 2006) (concluding that Wisconsin's "analytical approach has merit when ruling on the admissibility of a child's previous sexual experiences" to "prevent the jury from assuming that the defendant is responsible for the child's lack of sexual innocence"); *State v. Guthrie*, 518 S.E.2d 83, 95–96 n.20 (W. Va. 1999) (stating the Wisconsin test "may be a viable analytical tool for constitutional analysis of an evidentiary issue brought under our rape shield statute," while declining to adopt the test in that case).

his four-year-old niece. 935 N.W.2d at 876, 878. He appealed the district court's rape shield ruling excluding evidence that family members were concerned the victim's eight-year-old brother might have sexually abused her. *Id.* at 877. The defendant argued the evidence would show the victim's age-inappropriate sexual knowledge did not come from him. *Id.* We affirmed, in part because Walker failed to show the brother had in fact abused her and also on grounds that the proffered evidence was unduly prejudicial because it would confuse the issues, mislead the jury, and create a trial within a trial. *Id.* at 877–78. *Walker*, however, is distinguishable because L.V. admitted abusing S.V. and was charged with sexual abuse in delinquency proceedings.

The State again relies on *Jones*, 490 N.W.2d 787, which we find to be distinguishable. In *Jones*, Jones claimed the evidence of prior abuse by another person five years before Jones' alleged abuse was relevant to explain how the child knew of age-inappropriate information to make the allegations against him. 490 N.W.2d at 791. The victim was age thirteen years at trial and had attended sexual counseling as well as sex education classes before she testified. *Id.* We concluded those other sources of her sexual knowledge made it "unlikely that a jury would infer that the victim could only describe the act because Jones had, in fact, done it." *Id.* We noted "the rather unexplicit nature" of her testimony about Jones kissing and touching her. *Id.* at 791, 791 n.1. By contrast, S.V. explicitly described her abuser's penis as feeling "textured" and "muscly"— awareness not likely attributable to S.V. viewing pornography. Furthermore, the "completely different" nature of the prior abuse in *Jones*, and the fact it occurred

five years earlier, explained our determination that the prior abuse was only "marginally relevant" to show the victim's age-inappropriate knowledge related to what Jones did. *Id.* But on the record here, we conclude Montgomery should have been allowed to introduce evidence of L.V.'s contemporaneous, similar abuse to explain S.V.'s age-inappropriate knowledge, and thereby rebut the inference that Montgomery's abuse was the source of her knowledge.

Third, Montgomery argues his proffered evidence is admissible to show motive and bias. *See Twardoski*, 491 P.3d at 720–21 (holding evidence of another abuser favored by the victim should have been allowed to show her "motive to fabricate" allegations against the defendant whom she wanted "out of her mother's life"). S.V. favored L.V. and didn't want to get him in trouble. Dr. Jones-Thurman would have testified that in her experience, children sometimes accuse another to protect the real perpetrator. The State called L.V. as a witness at trial, thereby opening the door to cross-examination about his own sexual activity with S.V. "[I]n a case that hinges on a victim's credibility, evidence that impeaches one of the victim's few corroborating witnesses is, without question, favorable to the accused." *State v. Leedom*, 938 N.W.2d 177, 188 (Iowa 2020) (quoting *DeSimone v. State*, 803 N.W.2d 97, 105 (Iowa 2011)).

Federal precedent is compelling. In *Olden v. Kentucky*, the trial court excluded evidence that a key witness, Russell, was cohabitating with the victim. 488 U.S. 227, 230 (1988) (per curiam). The defense theory of the case was that the complainant fabricated the rape allegations to protect her relationship with Russell. *Id.* Olden and Harris were charged with kidnapping, rape, and forcible

sodomy. Olden was found guilty of forcible sodomy; Harris was acquitted. *Id.* According to the complainant, she was raped twice by Olden, during one of which Harris held her arms down. *Id.* at 228. According to the defendants, the sex was consensual. *Id.* at 229. Russell testified for the state that he saw the complainant get out of Harris's car and then she immediately told him that she had been raped. *Id.* By the time of trial, Russell, a Black man, was living with the complainant, a white woman. *Id.* at 230–31. The defense sought to admit evidence of their cohabitation, which the trial court excluded under a rape shield law because "its probative value [was] outweighed by its possibility for prejudice." *Id.* at 230. The Kentucky Court of Appeals affirmed, concluding that Olden's "right to effective cross-examination was outweighed by the danger that revealing [the complainant's] interracial relationship would prejudice the jury against her." *Id.* at 232.

The United States Supreme Court reversed, holding that the exclusion of the cohabitation evidence violated Olden's Sixth Amendment right to confront the witnesses against him. *Id.* at 231. The Court reasoned that the evidence could alter a reasonable juror's impression of Russell's credibility. *Id.* at 232. The Supreme Court concluded that "[s]peculation as to the effect of jurors' racial biases cannot justify exclusion of cross-examination with such strong potential to demonstrate the falsity of [the complainant's] testimony." *Id.* The Court emphasized that the State's case hinged on the credibility of the complainant and Russell's corroborating testimony. *Id.* at 233.

In *United States v. Platero*, the United States Court of Appeals for the Tenth Circuit applied *Olden* to allow "cross-examination and other evidence" of "a romantic or sexual relationship between" the complainant and a witness for the prosecution. 72 F.3d 806, 815–16 (10th Cir. 1995). Platero claimed he had consensual sex with the complainant moments before she rejoined the witness, who testified she immediately told him Platero had raped her. *Id.* at 808. Platero's theory of defense was that she "fabricated her sexual assault allegations . . . to protect her relationship" with the witness. *Id.* The witness and complainant denied they were in a romantic relationship at the time of Platero's assault but were living together by time of trial. *Id.* at 808–09. The Tenth Circuit limited use of the relationship evidence on remand, directing that the jury "first determine whether there was a romantic or sexual relationship between [the witness and complainant] *at the time of [Platero's] alleged assault*," and only if so, could the jury then consider the relationship evidence "in determining Platero's innocence or guilt." *Id.* at 816 (emphasis added). The *Platero* court's limiting principle on the timing of the relationship (and accompanying motive to fabricate) is satisfied here. Shortly after Montgomery allegedly abused S.V., L.V. started sexually abusing S.V., which continued until she reported Montgomery's abuse to her guidance counselor.

Other decisions are instructive on allowing evidence of contemporaneous sexual relations between the victim and a witness for the prosecution. In *Lewis v. Florida*, the defendant was convicted of sexually assaulting a child. 591 So. 2d 922, 923 (Fla. 1991). His theory of defense was that his stepdaughter fabricated

the allegations in order to prevent her mother and the defendant from discovering that she was sexually active with her boyfriend. *Id.* When the defendant sought to enter evidence regarding his stepdaughter's relationship with her boyfriend, the trial court limited the testimony:

> Accordingly, cross-examination before the jury established only that [the defendant's] accuser had a boyfriend, whom [he] and her mother did not want her to see, and that they placed her on restriction because of some letters she had written to the boyfriend. The jury was also allowed to learn that the victim's mother and stepfather told her she could not have a car. The jury, therefore, did not hear any of the facts regarding the stepdaughter's sexual activity, her concealing that activity when asked by her mother, or her attempts to prevent her mother and stepfather from confirming such activity through the scheduled gynecological exam.

*Id.* at 924. The appellate court determined the limitation unreasonably denied the defendant "the opportunity to confront his accuser and present his defense." *Id.* at 925 (quoting *Lewis v. State*, 750 So. 2d 412, 419 (Fla. Dist. Ct. App. 1990) (Allen, J., dissenting)). The limitation prevented the defense from arguing the stepdaughter fabricated allegations to prevent discovery of her sexual relationship with her boyfriend. *Id. But see Erick L.*, 147 A.3d at 1070 (affirming exclusion of evidence of victim's sexual relations with boyfriend offered to show her motive for falsely accusing defendant who grounded her because trial court permitted sanitized cross-examination on retaliation motive).

In *People v. Peppers*, defendant was convicted of aggravated criminal sexual abuse of a fifteen-year-old girl. No. 3–13–0343, 2016 WL 285180, at *1, *3 (Ill. App. Ct. 2016). According to the complainant, Nicholas Ferreira walked in on the defendant having sex with her and asked them to go elsewhere. *Id.* at *2. The defendant forced the complainant downstairs to finish having sex. *Id.* That

night, the complainant told Ferreira that the defendant raped her. *Id.* The defendant argued the sex was consensual and he reasonably believed the complainant to be seventeen years old. *Id.* at *3. The trial court ruled that the complainant's previous sexual history with the State's witness, Ferreira, was inadmissible under the rape shield law. *Id.* at *2. The appellate court reversed, holding that the defendant should have been permitted to cross-examine Ferreira about the relationship to show his bias resulting from the lack of criminal charges against him, to highlight his motive to fabricate testimony for someone he cared about, and to support the defendant's claim he reasonably believed that the complainant was seventeen years old because Ferreira had slept with her. *Id.* at *5.

Finally, excluding evidence of L.V.'s abuse presented a misleadingly incomplete picture to the jury. Multiple witnesses testified about S.V. coming forward in May 2018 to report Montgomery's abuse, without any mention that she simultaneously reported L.V.'s abuse. The jury was unaware that the nurse's physical examination of S.V. was three days after L.V. last abused her. Jurors could reasonably believe the forensic interview and physical examination of S.V. were to investigate Montgomery alone. The nurse's written report admitted into evidence included her identification of Montgomery as her abuser yet was redacted to delete S.V.'s identification of L.V. as another abuser. Most notably, the State called L.V. as a witness, without providing Montgomery with an opportunity to cross-examine him about L.V.'s own abuse of S.V. The rule of completeness further supports admissibility here. *See Westley*, 254 A.3d at 136

(applying "doctrine of verbal completeness" to determine if testimony opened the door to prior abuse evidence); *State v. Huser*, 894 N.W.2d 472, 507 (Iowa 2017) (noting that "the rule of completeness in Iowa Rule of Evidence 5.106 might be characterized as posing an open-the-door concept" and "is broader than the federal counterpart," and concluding that "the Iowa rule allows admission of 'any other . . . conversation' that meets the rule's requirements" (quoting Iowa R. Evid. 5.106(*a*))); Doré, § 5.106:1 ("[A]pplication of the rule prevents unfairness by protecting against the misleading impression which might result when all or part of written or oral evidence is read or heard out of context.").

The foregoing authorities demonstrate that the constitutional rights exception to the rape shield law under some circumstances allows evidence of the complainant's contemporaneous sexual relationship with a witness for the State. We hold that the district court erred by excluding evidence of L.V.'s abuse of the complainant. Montgomery should have been allowed to cross-examine S.V. and L.V. about their relationship and to introduce Dr. Jones-Thurman's expert testimony that children may testify falsely to protect an abuser they favor. Montgomery should have been able to argue that S.V. was reluctant to get her teenage "brother" L.V. in trouble and that their relationship explained how S.V. knew a penis is "textured" and "muscly." We vacate the court of appeals decision and reverse the district court's ruling on the rape shield law.

We must decide whether the erroneous exclusion of this evidence was harmless. Reversal is required for evidentiary error when "the error affects a substantial right of the party." Iowa R. Evid. 5.103(*a*). "We presume the

defendant's rights have been prejudiced unless the State can affirmatively establish otherwise. The State overcomes the presumption of prejudice if it can establish that there was overwhelming evidence of the defendant's guilt." *State v. Howard,* 825 N.W.2d 32, 41–42 (Iowa 2012) (citation omitted). The jury acquitted Montgomery of lascivious acts while convicting him of sexual abuse. A possible conclusion is that the jury largely disbelieved S.V. and convicted Montgomery based on his own admissions that he let her place his hand on her groin area twice and "didn't do anything that [S.V.] didn't initiate first." If the jury didn't believe S.V. anyway, Montgomery arguably was not harmed by the exclusion of evidence that could have undermined her credibility.

Our role, however, is not to read the minds of the jurors or replace them as fact finder. Montgomery claimed he immediately pulled his hand away both times after she pulled his hand to her groin. There is no DNA or other physical evidence that he abused S.V. He denies abusing her. No witness saw him abusing her. We do not find the evidence of guilt to be overwhelming. We determine the evidentiary errors were not harmless and require a new trial. *See State v. Shaw,* 90 A.3d 936, 955 (Conn. 2014) (holding exclusion of prior abuse evidence was not harmless when "the state's case was not particularly strong because there was no direct evidence that [the victim] was sexually assaulted by the defendant"); *cf. Pulizzano,* 456 N.W.2d at 335 (declining to apply harmless error rule when rape shield ruling deprived defendant of evidence necessary to her defense).

**IV. Conclusion.**

For those reasons, we vacate the court of appeals decision on the rape shield issue, affirm the court of appeals decision on the remaining issues, reverse the district court's judgment, and remand the case for a new trial consistent with this opinion.

**DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED FOR A NEW TRIAL.**

All justices concur except Appel, J., who concurs specially, and McDermott, J., who separately concurs specially.

**APPEL, Justice (concurring specially).**

I agree with the result and most of the majority opinion. In my view, however, stare decisis is not at work unless the court believes that the underlying decision was incorrectly decided. *State v. Sewell,* 960 N.W.2d 640, 651 (Iowa 2021) (Appel, J., concurring in part and dissenting in part); *Youngblut v. Youngblut,* 945 N.W.2d 25, 45 (Iowa 2020) (McDonald, J., dissenting). In my view, the majority offers the best interpretation of the statute and affirms prior authority. As a result, the doctrine of stare decisis, though cited, has no role in the resolution of the statutory interpretation issue in this case.

I also give little weight to the doctrine of legislative acquiescence in this case. As a general proposition, though frequently cited, legislative acquiescence is a relatively weak doctrine. There are all kinds of reasons why a legislature may decline to act after a judicial decision interpreting a statute. Few legislators would want to explain a vote cast to narrow the scope of a judicial interpretation of a sexual abuse statute. *Cf.* William J. Stuntz, *The Pathological Politics of Criminal Law,* 100 Mich. L. Rev. 505, 547–49 (2001) (noting that the politics of criminal law leads to a "one-way ratchet" of ever increasing criminal penalties). Further, an unanticipated broad ruling of the scope of a sexual abuse statute by a court is likely to be viewed by legislators as more a windfall than as a problem.

As a result, in my view, the doctrine of legislative acquiescence does not materially impact the result in this case. That is not to say that the doctrine of legislative acquiescence has no place in the interpretive toolkit available to the

court to assist in the resolution of disputes about statutory meaning. But it has little bearing here.

Finally, I have no problem considering federal authority as an aid in interpreting Iowa rules of evidence that are parallel to similar federal rules to the extent the reasoning in the federal cases is persuasive. There is, of course, no presumption that the federal courts got it right. They are not our superiors in the interpretation of state law, and our authority to decide such issues cannot be delegated, in whole or in part, to the federal courts. I also note that state courts are likely to have more experience with rape shield law issues than federal courts, and as a result, the reasoning of decisions of other state courts may be more persuasive than federal caselaw. In any event, in each and every case, it is our obligation to independently decide the state law evidentiary questions raised by the parties through application of the reasoning and rationale—from whatever the source—that the court finds is most compelling or persuasive. Based on my review of the federal and state authorities and the wording of our rape shield law, I agree that the best approach to the interpretation of Iowa Rule of Evidence 5.412 is embraced by the majority opinion.

**McDERMOTT, Justice (concurring specially).**

I join in the court's opinion except for those parts that rely on legislative acquiescence and stare decisis. I believe the court's careful textual analysis of Iowa Code section 702.17 demonstrates that a sex act need not be made to arouse or satisfy the sexual desires of the perpetrator or the victim so long as the act is "sexual in nature." Having provided a full basis for its holding, the court's recitation of legislative acquiescence as another basis supporting the holding is in my view unnecessary and, more importantly, runs counter to proper textual analysis.

If we erroneously interpreted section 702.17 in *State v. Pearson*, 514 N.W.2d 452 (Iowa 1994), as the defendant urges (and, for the textual reasons the majority provides, we did not), then we shouldn't let the lack of any statutory changes to the law constrain us to inaction in fixing it. "The court is always free to correct its own mistakes, and legislative inaction is not a bar to doing so." *State ex rel. Iowa Dep't of Health v. Van Wyk*, 320 N.W.2d 599, 607 (Iowa 1982) (McCormick, J., dissenting).

Justice Scalia maintained that reliance on legislative acquiescence "haunts" judicial opinions and urged it "should be put to rest." *Johnson v. Transp. Agency*, 480 U.S. 616, 671 (1987) (Scalia, J., dissenting). He believed it was "based, to begin with, on the patently false premise that the correctness of statutory construction is to be measured by what the current Congress desires, rather than by what the law as enacted meant." *Id.* "To make matters worse, it

assays the current Congress' desires *with respect to the particular provision in isolation,*" thus ignoring the legislative process's give-and-take required to create the "total legislative package" in which the isolated provision happens to reside. *Id.* The Constitution "creates an inertia" through its "complicated check on legislation" that, according to Scalia, "makes it impossible to assert with any degree of assurance" that inaction represents approval of the status quo. *Id.* at 672 (quoting *The Federalist No. 62*, at 378 (James Madison) (Clinton Rossiter ed., 1961)). "[O]ne must ignore rudimentary principles of political science to draw any conclusions regarding [a current legislature's] intent from the *failure* to enact legislation." *Id.* at 671–72; *see also* Frank H. Easterbrook, *Stability and Reliability in Judicial Decisions*, 73 Cornell L. Rev. 422, 426–27 (1988) ("Today's Congress may leave in place an interpretation of a law simply because today's coalitions are different. The failure of a different body to act hardly shows that the interpretation of what an earlier one did is 'right.' ").

The mere fact that a legislature *could* take action "is no excuse for failing to overrule a statutory precedent of ours that is clearly wrong, for the realities of the legislative process often preclude readopting the original meaning of a statute that we have upset." *Clark v. Martinez*, 543 U.S. 371, 402 (2005) (Thomas, J., dissenting). Our interpretation should be based on what the text says and fairly implies—as the court otherwise did in the opinion—not on our suppositions about what a legislature's inaction might mean.

I otherwise fully join the court's opinion on all the issues presented.